MESCALERO APACHE TRIBE, on its own behalf and on behalf of the Individual Members of the Mescalero Apache Tribe, and Lewis Lapaz, Plaintiffs,

v.

Everett RHOADES, Director Indian Health Services, Josephine T. Waconda, Area Director of Albuquerque Indian Health Services, Department of Health and Human Services, and the United States of America, Defendants.

Civ. No. 89–0401 JP.

United States District Court,
D. New Mexico.

Sept. 22, 1992.

---

George E. Fettinger and Norman D. Bloom, Jr., Fettinger & Bloom, Leslie L. Seckler, Alamogordo, N.M., for plaintiffs.

Marilyn S. Johnson, U.S. Attys. Office, D. N.M., Albuquerque, N.M., Timothy M. White, for defendants.

## MEMORANDUM OPINION AND ORDER

PARKER, District Judge.

The subjects of this memorandum opinion and order are plaintiffs' motion for summary judgment, filed April 12, 1991, and defendants' cross-motion for summary judgment, filed April 26, 1991. At request of the court, both parties submitted supplemental briefs, filed March 11, 1992, in support of their respective motions. The parties are in agreement as to all material facts, leaving this court with the task of deciding the remaining legal dispute. Having thoroughly considered the pleadings, facts and law, and being otherwise fully advised in the matter, I conclude that plaintiffs' motion should be granted and defendants' motion should be denied.

## I. BACKGROUND

Plaintiff Lewis LaPaz ("LaPaz") is a member of the Mescalero Apache Tribe ("Tribe") and a resident of its reservation located in Otero County, New Mexico. For more than thirty years LaPaz has served in continuous employment with the U.S. government, since 1979 holding employment with Indian Health Services ("IHS") as a van driver at the agency's Mescalero Service Unit Hospital. The dispute in this case arises out of LaPaz's entry into tribal politics and government, creating an alleged conflict of interest with his federal employment. After LaPaz successfully sought election to the Mescalero Tribal Council, a position which he continues to hold, the Director of IHS, defendant Everett Rhoades ("Rhoades"), determined that La-Paz's elected position is incompatible with Department of Health and Human Services ("HHS") standards of conduct. 45 C.F.R. § 73.735–701(a) & (b). Consequently, the Director of the Albuquerque Area IHS, defendant Josephine T. Waconda ("Waconda"), ordered LaPaz either to resign from the Tribal Council or to submit his resignation from federal employment. LaPaz's subsequent administrative appeals of this order failed; Rhoades denied LaPaz's final appeal on February 1, 1989.[1] By this suit, plaintiffs charge that the government's action contravened both the Indian Reorganization Act, 25 U.S.C. § 461 *et seq.*, and the Indian Self–Determination Act, 25 U.S.C. § 450 *et seq.*, by applying general conflict of interest regulations to LaPaz's political activities, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06.

## II. JURISDICTION

Before I proceed to examine the substance of the parties' cross-motions for summary judgment, a short discussion is in order of this court's jurisdiction over the claims of plaintiff LaPaz. By prior opinion in this case, *Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. 1484 (D.N.M.1990), I denied defendants' motion to dismiss for lack of standing and jurisdiction. Nonetheless, because, in the course of the briefing of the cross-motions for summary judgment, defendants have raised two new issues bearing on jurisdiction, I turn again to the jurisdictional question.

Defendants' argument goes to my concern that absent judicial review by this court, plaintiffs might be left with inadequate means of redress. *See Mescalero*

---

**1.** My prior opinion in this case, *Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. 1484, 1485–86 (D.N.M.1990), provides a more thorough summary of the factual background of this dispute.

*Apache Tribe v. Rhoades,* 755 F.Supp. at 1489–90. Defendants point to the passage, since the filing of this action, of two laws that purportedly preclude this court's jurisdiction over plaintiffs' claims and make appeal to the Merit Systems Protection Board ("MSPB") the appropriate avenue of review, in accordance with the Civil Service Reform Act of 1978 ("CSRA"), Pub.L. 95–454, 92 Stat. 111 *et seq.* (1978) (codified in scattered sections throughout Title 5 of the United States Code). With specified exceptions,[2] CSRA denies district court jurisdiction to federal employees appealing disputed personnel actions.

■ The first statute cited by defendants is the Whistleblower Protection Act of 1989, Pub.L. 101–12, § 3(a)(13), 103 Stat. 29 (1989), 5 U.S.C. § 1221. It is defendants' position that this Act, because it allows for appeal to the MSPB, provides plaintiff LaPaz with adequate appellate review. Defendants are incorrect. The "prohibited personnel practice" against which the Act seeks to protect is, as its title suggests, reprisal for disclosure of official misconduct. 5 U.S.C. § 1221(a) (referencing 5 U.S.C. § 2302(b)(8)). In discussing the legislative history of the Act, the Federal Circuit recently stated:

> The Whistleblower Protection Act of 1989 ... was created to improve protection from reprisal for federal employees who disclose, or "blow the whistle" on, government mismanagement, wrongdoing, or fraud. S.Rep. No. 413, 100th Cong., 2d Sess. 1 (1988); 5 U.S.C. § 1201 note (Supp.1990). Congress thought such improved protection desirable because whistleblowers serve the public interest by assisting in the elimination of fraud, waste, abuse, corruption, and unnecessary government expenditures. 5 U.S.C. § 1201 note (Supp.1990).

*Knollenberg v. Merit Systems Protection Board,* 953 F.2d 623, 625 (Fed.Cir.1992). *See Rivera v. United States,* 924 F.2d 948, 952–54 (9th Cir.1991). A characterization

of the facts in the instant action as retaliation for whistleblowing is simply erroneous. Furthermore, as defendants themselves recognize, Congress enacted the Whistleblower Protection Act after defendants had presented LaPaz with the employment ultimatum at issue in this case. The Act does not provide for an individual right of action under § 1221 for personnel actions taken prior to the effective date of the Act on July 9, 1989. *See Knollenberg,* 953 F.2d at 625. Defendant Waconda, by memorandum of March 21, 1988, disqualified LaPaz from both serving on the Tribal Council and retaining his federal employment; Rhoades denied LaPaz's final appeal on February 1, 1989. Although defendants have not carried out the ultimatum, the mere proposal or threat of personnel action would be sufficient to constitute an actionable occurrence for purposes of the Whistleblower Protection Act. *See* 5 U.S.C. § 2302(b)(8); *Knollenberg,* 953 F.2d at 625. Accordingly, the Whistleblower Protection Act has no bearing on this litigation.

■ Second and more helpful is defendants' reliance on the Civil Service Due Process Amendments, Pub.L. 101–376, §§ 2(a), 2(b) & 3(2), 104 Stat. 461 & 462 (1990), 5 U.S.C. §§ 4303(e), 7511(a)(1)(C) & 7701(j). Effective August 17, 1990, the legislation amended CSRA "to allow non-probationary, non-preference eligible excepted service employees to appeal adverse personnel actions to the MSPB ... and to the Federal Circuit...." *Pension Ben. Guaranty Corp. v. Federal Labor Relations Authority,* 967 F.2d 658, 666 n. 11 (D.C.Cir. 1992). The purpose of the Amendments was to extend to non-preference eligible employees in the excepted service the same administrative and appellate procedures already available to both competitive service employees and preference eligible excepted service employees. H.R.Rep. No. 328, 101st Cong., 1st Sess. (1989), U.S.Code Cong. & Admin.News 1990, p. 695. In view of the passage of the Civil Service Due Process Amendments and assuming the ap-

---

**2.** 5 U.S.C. § 7703(b)(2) allows employees complaining of discriminatory action in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, or the Fair Labor Standards Act of 1938 to file in federal district court after exhausting administrative remedies.

plicability of the Amendments to this suit, defendants are correct that the provisions of the Amendments resolve one of my doubts concerning the availability of review under the CSRA framework, specifically that LaPaz's employment status could serve to obstruct review by the MSPB.

Nonetheless, the amendments do not assure that the MSPB would have jurisdiction over LaPaz's claims, leaving me still unwilling to relinquish jurisdiction. As I discussed previously, *Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. at 1490, even if LaPaz were to have available to him the full extent of CSRA's administrative and appellate procedures, the MSPB may still lack jurisdiction to hear his claim, for aggrieved employees have a right of direct appeal to the MSPB only where relatively serious sanctions are invoked.[3] Chapter 43 entitles an employee "who has been reduced in grade or removed under this section ... to appeal the action to the Merit Systems Protection Board under section 7701 of this title." 5 U.S.C. § 4303(e). Likewise, Chapter 75 permits such an appeal where the grievance is a major adverse "action," which includes "removal; suspension for more than 14 days; reduction in grade; reduction in pay; and a furlough of 30 days or less." 5 U.S.C. §§ 7512(1)–(5) & 7513(d). *See United States v. Fausto*, 484 U.S. 439, 444–47, 108 S.Ct. 668, 672–73, 98 L.Ed.2d 830 (1988); *Ryon v. O'Neill*, 894 F.2d 199, 203 (6th Cir.1990). *See also Johnson v. Orr*, 747 F.2d 1352, 1355–56 (10th Cir.1984) (holding MSPB did not have jurisdiction over an enforced leave claim, as employment action did not fall under appealable actions enumerated under § 7512). Moreover, the Civil Service Due Process Amendments' revision of CSRA's appeals provisions, Chapter 77, speaks only in terms of "removal from the service," Pub.L. 101–376, § 3(2), 104 Stat. 462, 5 U.S.C. § 7701(j). *See Jesko v. Department of Veterans Affairs*, 52 M.S.P.R. 517, 520 (1992) (commenting that § 7701(j) applies only to a "removal"). I remain unconvinced that the disqualifica-

tion ultimatum presented to LaPaz constitutes an adverse action appealable to the MSPB, with the right of subsequent judicial review by the Federal Circuit.

Moreover, as with the passage of the Whistleblower Protection Act, the enactment of the Civil Service Due Process Amendments occurred after the accrual and filing of plaintiff LaPaz's action. Section 2(c) of the Amendments provided: "The amendments made by this section [amending §§ 4303 and 7511 of Title 5] shall apply with respect to any personnel action taking effect on or after the effective date of this Act [Aug. 17, 1990]" 5 U.S.C. § 4303 note (1992). In addition, section 4 of the Act states: "this Act [amending §§ 4303, 7511 and 7701 of Title 5] shall become effective on the date of this [Aug. 17, 1990], and except as provided in section 2(c), shall apply with respect to any appeal or other proceeding brought on or after such date." *Id.* *See* H.R.Rep. No. 328, 101st Cong., 1st Sess. (1989). *See also Bey–Ali v. Department of Navy*, 51 M.S.P.R. 207, 209 & 210 n. 3 (1991) (MSPB lacked jurisdiction over appeal of May 4, 1990 removal of nonpreference eligible Navy employee in the excepted service). Consequently, LaPaz's employment status could, notwithstanding the 1990 Amendments, serve to bar adequate recourse to the courts, were I to repudiate the jurisdiction of this court. *See Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. at 1489–90. *Cf. Beverlin v. I.R.S.*, 574 F.Supp. 553, 555–56 (W.D.Mo.1983) (Act offered insufficient recourse to probationary employee, permitting district court review); *Kennedy v. United States*, 5 Cl.Ct. 792, 793–94 (1984) (CSRA does not abrogate court's jurisdiction over cases where statutorily created substantive right is violated and CSRA does not permit review).

█ Finally, with respect to the jurisdiction issue, I make the following comment. By finding jurisdiction over plaintiff LaPaz's claims, I am not allowing a circumvention of the CSRA framework, which

---

**3.** The MSPB's jurisdiction is limited to subjects provided for by statute or regulation. *Cowan v. United States*, 710 F.2d 803, 805 (Fed.Cir.1983); *Ad Hoc Committee for Integrity in Dept. of Energy v. Hodel*, 594 F.Supp. 569, 571 (D.D.C.1984).

retains its exclusivity as the remedial mechanism by which an aggrieved federal employee may seek review and redress for a disputed personnel action.[4] It is not within the province of this court to evaluate the propriety of such an action, itself. This court, however, may rightfully examine the propriety of regulations on which a personnel action is based, when those regulations may contravene the Indian Preference Act or other statutory Indian law.[5] *See Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir.1991) (CSRA is the exclusive remedy only for the types of adverse actions specifically covered by the Act). Because the issue before this court does not fall within the CSRA remedial framework, my limited examination is not precluded by that statute.[6] Absent review by this court, at the outset, of the substantive Indian law issues of this litigation, I doubt the dispute between the parties would receive proper judicial consideration.[7]

## III. PLAINTIFFS' CLAIMS

Plaintiffs allege that the government's application of general civil service law constitutes a failure to comply with the Indian statutory law, governing employment preference and tribal self-rule, in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.[8] Section 702 of the APA provides, in part:

A person suffering legal wrong of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702. Plaintiffs seek equitable relief from defendants' alleged impermissible administrative action.

### A. *Preference in Employment*

■■■■ Plaintiffs first maintain that the government violated § 12 of the Indian Reorganization Act, commonly known as the Indian Preference Act, 25 U.S.C. § 472, by applying general conflict of interest regulations to LaPaz's membership on the tribal council. Defendants counter that LaPaz's grievance does not come within the reach of the Indian Preference Act because the

---

4. CSRA will continue to operate as an integrated and comprehensive management system, with a detailed scheme of administrative and judicial review. *Fausto*, 484 U.S. at 445, 108 S.Ct. at 672; *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 773, 105 S.Ct. 1620, 1624, 84 L.Ed.2d 674 (1985).

5. Once IHS has corrected any inconsistency between its conflict of interest regulations and statutory Indian law, the CSRA appellate machinery will be free to begin operating on LaPaz's claim, if he then has one. At that time, LaPaz would receive no more and no less procedural redress than CSRA affords. *See Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. at 1487 n. 5.

6. Likewise, neither the CSRA nor any other law commits to defendants discretion over this matter. Thus, review is appropriate under 5 U.S.C. § 701(a). *See Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 641–42 (10th Cir.1990).

7. Beyond the doubts I have already expressed, I question the capacity of the CSRA appellate process to encompass and confront the instant controversy. This dispute is not a routine employment grievance. This case involves an important question of public policy that may not secure its due attention through the CSRA's rigidly structured remedial scheme. Even were appeal to the MSPB available with certainty, both the scope and standard of MSPB review appear lacking. *See, e.g., Beard v. General Services Admin.*, 801 F.2d 1318, 1322 (Fed.Cir.1986) (MSPB applies abuse-of-discretion standard in reviewing agency's choice of penalties); *Murphy v. Department of Navy*, 25 M.S.P.R. 333, 338 (1984) (if Board determines that an agency imposed penalty is clearly excessive, disproportionate to the sustained charges or arbitrary, capricious or unreasonable, Board may review and mitigate penalty); *Hipona v. Department of Army*, 39 M.S.P.R. 522, 525 (1989) (Board's review limited by authority granted to it by pertinent statutes and regulations).

8. In their Complaint, plaintiffs state: "Defendants' action is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to 5 U.S.C. Sec. 706(2)(A)." Complaint, 4, para. 17.

Act pertains only to the hiring, transferring and promoting of federal employees. Whether the Act encompasses a threatened removal is the issue I now address. In examining this question, I am mindful of the long accepted principle of Indian law that statutes dealing with Indians must be construed liberally in their favor. *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

At the time of the Indian Preference Act's passage in 1934, when Indian employees comprised only 34% of all employees working at the Bureau of Indian Affairs, Congress sought to increase the number of Indian employees with the establishment of a hiring preference. *See Morton v. Mancari*, 417 U.S. 535, 542–45, 94 S.Ct. 2474, 2478–80, 41 L.Ed.2d 290 (1974). The Act provided, and still provides, a preference to Indians only in "appointment to vacancies." [9] 25 U.S.C. § 472 (1983). The hiring preference, of course, was merely a mechanism; the overriding end of the Act was to enable Indian Tribes to assume greater participation in their own self-government, by involving more Indians in the federal administration of matters affecting Indian tribal life. *See Morton*, 417 U.S. at 541–42, 94 S.Ct. at 2478–79. Accordingly, the expansion of the preference mechanism, in 1972, to include promotions "appears to be a logical extension of the congressional intent." *Id.* at 545, 94 S.Ct. at 2480. *See Freeman v. Morton*, 499 F.2d 494, 497–99 (D.C.Cir.1974) (holding that, in addition to initial hiring, the Act applies to appointment to vacant positions by promotion, reassignment or lateral transfer); *Preston v. Heckler*, 734 F.2d 1359, 1371 n. 15 (9th Cir.1984) ("Given that the purpose of the Indian Preference Act is to allow Indians to control programs that serve Indians, the

preference logically would apply to a variety of employment decisions besides the type of hiring involved here.").

Despite the sweeping statement of the Indian Preference Act's purpose, defendants contend that the Act explicitly and unambiguously limits its effective means to the filling of vacancies. Case law most supportive of that position comes from this circuit and involved the same plaintiff tribe. In *Mescalero Apache Tribe v. Hickel*, 432 F.2d 956 (10th Cir.1970), *cert. denied*, 401 U.S. 981, 91 S.Ct. 1195, 28 L.Ed.2d 333 (1971), the court held that the Act does not comprehend preferential treatment of Indians in the instance of a reduction in force. After determining that the Act is "specifically limited to 'appointment to vacancies[,]' " *id.* at 958, the court concluded:

> Congress intended to promote Indian employment in the B.I.A. but also to provide job security for non-Indian employees by giving Indians only a preference in the "appointment to vacancies." This security is lost if the Indian preference statutes are applied to reductions in force....
>
>   \*   \*   \*   \*   \*   \*
>
> Although qualified Indians are to be actively sought and accorded a preference in initial hiring, it may still be necessary to employ non-Indians whenever it is not practicable to do otherwise.

*Id.* at 961. But, by subsequent legislation, Congress expressly supplanted this holding. Pub.L. 96–135 (1979); 25 U.S.C. § 472a(a). *See* 1979 U.S.Code Cong. and Admin.News, p. 2077. The superseding legislation made evident that the Indian Preference Act extends not only to the filling of vacancies but also to the retention of Indian employees in the face of a reduc-

---

**9.** As enacted in 1934, section 12 of the Indian Reorganization Act, which constitutes the Indian Preference Act, states:

> The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed, without regard to civil service laws, to the various positions maintained, now or hereafter, by the Indian Office, in the administration of functions or services affecting any Indian Tribe. Such qualified

Indians shall hereafter have the preference to appointment to vacancies in any such positions.

48 Stat. 986 (1934). At present, the Secretary of the Department of Health and Human Services holds the responsibility for enforcing the Indian Preference Act with regard to the providing of health services to Indians. Pub.L. No. 83–568, 68 Stat. 674 (1954), 42 U.S.C. § 2001 (1976 & Supp. V 1981) (cited in *Preston v. Heckler*, 734 F.2d 1359, 1367 n. 10 (9th Cir.1984)).

tion in force. Congress, however, did not address whether the Act extends preferential treatment to other types of personnel actions operating adversely to the retention of Indian employees. Particularly, Congress has not indicated whether a threatened removal, such as that at issue in this case, comes within the preference afforded by the Act. On that basis, I conclude that the Act does not encompass a removal ultimatum. The force and effect of the Act springs from its express language and that of its amendments. Section 472 gives a preference in appointment to vacancies; section 472a extends the preference to reductions in force. Though construing the Act liberally in favor of plaintiffs, I find insufficient basis for holding that the Act's mandate, that Indian employees be treated "without regard to civil service laws," supports plaintiffs' claims under the Indian Preference Act.[10]

In coming to this conclusion, I am aware that my ruling may conflict with the Eighth Circuit's opinion in *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir.1979). In that case, the Oglala Sioux Tribe brought suit against the federal government challenging agency action alleged to violate the Indian Preference Act. Applying general conflict of interest regulations, the Bureau of Indian Affairs had ordered the transfer of a member of the Tribe from his position as Agency Superintendent to a position off the reservation in the wake of his brother's election to the Tribal Presidency. The court ruled that the Bureau of Indian Affairs' reliance on general conflict of interest regulations to "remove" the employee violated the Indian Preference Act. *Id.* at 714. To the extent the employment action in dispute in *Oglala Sioux* is more properly characterized as a transfer rather than a removal, the instant litigation is distinguishable. However, if the employment action in *Oglala Sioux* is better understood to be a removal, I believe the Eighth Circuit's extension of the Indian Preference Act in that instance was unjustified.

### B. *Self–Government*

■ Yet, this dispute is much more than a question of the extent of federal employment preferences for Indians. And, although the Indian Preference Act is only equipped with a narrowly defined mechanism for carrying out its broadly stated purpose, that purpose is reflected in other legal mandates, not so limited. Defendants' administrative action not only tests the employment protections afforded by the Indian Preference Act; it also constitutes an assault on plaintiffs' free exercise of self-rule, guaranteed by statute and tribal constitution.[11]

10. Even though the Act compels this conclusion, the Act's hiring-versus-firing distinction proves somewhat troublesome in this case, producing what appears to be a contradictory result. Under the interpretation advanced by defendants and adopted by this court, an Indian employee in the Indian civil service seeking election to tribal office is subject to general civil service regulations, while a member of the tribal council seeking appointment to federal employment falls within the scope of the Act and may demand its protections.

11. In view of the forthcoming discussion, ruling that defendants have violated the Indian Self–Determination Act, I do not reach the issue of defendants' alleged violation either of the Indian Reorganization Act, beyond § 12, discussed above, or of the Mescalero tribal constitution, though both underscore the federally recognized importance of tribal self-rule. The Indian Reorganization Act, 48 Stat. 987 (1934), 25 U.S.C. § 461 *et seq.* (1983), established a framework within which Indian tribes could strengthen and revitalize their self-government. *See Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1271, 36 L.Ed.2d 114 (1973). "The intent and purpose of the Reorganization Act was 'to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression.'" *Id.* at 152, 93 S.Ct. at 1272 (quoting H.R.Rep. No. 1804, 73rd Cong., 2d Sess., 6 (1934). Section 16 of the Act provides for the adoption of tribal constitutions and bylaws. 25 U.S.C. § 476. *See Cheyenne River Sioux Tribe v. Andrus*, 566 F.2d 1085, 1086 (8th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978). The Constitution of the Mescalero Apache Tribe guarantees "all members of the ... Tribe shall have equal rights and equal opportunities to participate in the economic resources and tribal assets, and no member shall be denied freedom of conscience, speech, religion, association or assembly...." Plaintiffs' Motion for Summary Judgment, exh. I, Art. V. In accordance with 25 U.S.C. § 476, the Tribe's Constitution was approved by the Secretary of

In enacting the Indian Self–Determination Act of 1975, Pub.L. 93–638, 88 Stat. 2203 (1975), as amended, Pub.L. 100–472, 102 Stat. 2285 (1988), 25 U.S.C. § 450 *et seq.* (1983 ed. and 1992 Supp.), Congress pronounced the following statement of federal policy:

> The Congress declares its commitment to the maintenance of the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy which will permit an orderly transition from Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services. In accordance with this policy, the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of the their respective communities.

25 U.S.C. § 450a(b). *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 216 & n. 19, 107 S.Ct. 1083, 1092 & n. 19, 94 L.Ed.2d 244 (1987); *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334–35 & n. 17, 103 S.Ct. 2378, 2386–87 & n. 17, 76 L.Ed.2d 611 (1983). Underlying this federal policy declaration are the dual purposes of providing full participation by Indian tribes in federal programs for Indians and of promoting "maximum Indian participation in the government and education of the Indian people." [12] H.R.Rep. No. 1600, 93rd Cong. (1974), 1974 U.S. Code Cong. & Admin.News, p. 7775. The Act and its amendments demonstrate clearly the congressional intent and legislative trend of paving the way for greater tribal self-government, particularly in the contracting by tribes for the administration of federal programs serving Indians. "The federal policy of Indian self-determination is one of the most progressive federal Indian policies in our Nation's history. The self-determination policy is premised on the notion that Indian tribes are the basic governmental units of Indian policy." S.Rep. No. 274, 100th Cong. (1987), 1st Sess., 1988 U.S. Code Cong. & Admin.News, pp. 2620, 2622, 1987 WL 61567, p. 3 (Leg.Hist.) (Senate report, Pub.L. 100–472 (1988)). Moreover, the Act "provides tribes with the flexibility to redesign Federal programs and services to meet the needs of Indian people." *Id.* at 5, 1988 U.S.Code Cong. & Admin.News, p. 2624.

Although the Self–Determination Act focuses on Indian tribes' assumption of control over federal programs serving Indians, I do not read the Act to leave tribes with no substantive role in the operations of such programs short of a tribal take-over. Such an all-or-nothing position, however, is precisely that taken by defendants in this litigation. LaPaz is employed as a motor vehicle operator in a program currently run by Indian Health Services. Presumably, the Tribe could contract with the Secretary of Health and Human Services to operate the Mescalero Service Unit Hospital program in which LaPaz works.[13] *See* 25

---

the Interior, March 25, 1936 (revised January 12, 1965).

**12.** Concordant with these purposes is the development of leadership skills in Indians. 25 U.S.C. § 450(a). *See Alaska Chapter, Associated General Contractors, Inc. v. Pierce,* 694 F.2d 1162, 1170 (9th Cir.1982).

**13.** "The Act directs the Secretary ... to enter into a contract with Indian organizations at the request of Indian tribes. Self-determination contracts with Indian tribes are not discretionary. The Act contains only limited reasons for declination to contract by [the] Secretary. If a contract application is declined, the burden of proof is on the Secretary to show that the statutory grounds for declination exist." S.Rep. No. 274, 100th Cong. (1987), 1st Sess., 1988 U.S.Code Cong. & Admin.News, pp. 2620, 2622, 1987 WL 61567, p. 3 (Leg.Hist.) (Senate report, Pub.L. 100–472 (1988)).

Interestingly, a basis for disqualifying LaPaz would appear more defensible in the instance of a tribal take-over of the IHS program. In seeking to disqualify LaPaz, defendants reasoned that the steadily increasing contracting activities between IHS and tribal organizations make it likely that an individual serving on the tribal council would represent the tribe before the government, creating a conflict between the individual's dual responsibilities. That conflict, though, would be heightened upon the Tribe's

U.S.C. § 450f (1992 Supp.). And, if the Act permits the Tribe full control over a program, then the assumption of something less than full control would also appear to comport with the Act's policy declarations. Simply because a tribe does not take *full* control of a federal program does not lead perforce to the conclusion that the tribe may exercise *no* say in the federal government's operation of the program, despite its impact on tribal interests. The content and enforcement of conflict of interest regulations when applied to a tribal member, such as LaPaz, comprise just the sort of interest of which both the Tribe and the affected member may demand lawful protection.[14] Consequently, I turn to an examination of the propriety of the defendants' administrative action under the APA.

## C. *Administrative Procedure Act*

■ Informal agency action is reviewed under the standard described by the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). A reviewing court will set aside an agency action "if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). *See Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 643 (10th Cir.1990); *Cotton Petroleum Corp. v. United States Dept. of Interior, Bureau of Indian Affairs*, 870 F.2d 1515, 1525 (10th Cir.1989).

Defendants argue that the personnel action taken against LaPaz comported with applicable law, affording sufficient protec-tion of plaintiffs' interests. In disqualifying LaPaz, defendants relied on Department of Health and Human Services's regulations governing employee standards of conduct, 45 C.F.R. § 73.735–101 to –1401. When defendant Rhoades learned of LaPaz's election to the Tribal Council, he directed LaPaz to comply with the HHS standards by submitting a request for approval to engage in "outside activity" as required by § 73.735–708(a)(4). LaPaz submitted the request, and on June 1, 1987 Rhoades denied it, finding the activity incompatible with § 73.735–701(a) & (b). After LaPaz re-submitted the request for approval, defendant Waconda wrote to LaPaz informing him that Rhoades had reevaluated the request and had reaffirmed his decision to deny it. As grounds for the denial, Waconda cited 18 U.S.C. §§ 203 and 205, which make it a crime for a federal employee to serve as an agent for someone before the federal government. Waconda stated that the steadily increasing contracting activities between IHS and tribal organizations, among other things, make it likely that an individual serving on the tribal council would represent the tribe before the government, in contravention of the cited criminal sections. *See Mescalero Apache Tribe v. Rhoades*, 755 F.Supp. 1484, 1485–86 (D.N.M.1990) (providing a more thorough summary of the factual background of this dispute).

■ The propriety of defendants' decision to disqualify LaPaz turns on the validity of defendants' application of HHS standards of conduct, 45 C.F.R. § 73.735–101 to –1401.[15] In examining this question, my

---

assumption of direct and full control over the IHS program. Yet, the Self–Determination Act does not list conflict of interest considerations as one of the grounds for denial of a program's transfer from the government to a tribe, *see* 25 U.S.C. § 450f(a)(2); and, even if that consideration could be pigeonholed within one of the enumerated bases, thereby resulting in denial, the Tribe could then conscript in its favor the Act's procedural safeguards. *See* 25 U.S.C. § 450f(b).

Of course conflicts of interest must be guarded against. The point of this litigation is not whether Indian employees should be subject to conflicts constraints. Surely, they should. The issue is how those constraints should be deter-mined and administered. Should the Tribe have a substantive say in the government's promulgation and application of its regulations affecting tribal government? If the Tribe were to exercise its authority to take over the IHS program, the Tribe would have full authority to develop its own applicable conflicts regulations.

**14.** I observe that, as plaintiffs have met the requirements for judicial review under the APA, I need not decide whether they would also have an implied private right of action under the Indian Self–Determination Act.

**15.** During LaPaz's grievance process, defendants also cited 18 U.S.C. §§ 203 and 205 as grounds for the action. Generally, a reviewing court

review is a narrow one. An agency's interpretation of its own administrative regulation demands a high level of deference from a reviewing court. *Grynberg v. Watt*, 717 F.2d 1316, 1318 (10th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984) (citing *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1969)). The court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824. *See Grynberg*, 717 F.2d at 1318. The Court will set aside the agency determination if the court is "able to discern the agency ... 'entirely failed to consider an important aspect of the problem....'" *Thomas Brooks*, 920 F.2d at 644 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). Keeping in mind the limited review permitted under the APA, I also recognize and reiterate the long-standing principle of Indian law that statutes dealing with Indians must be construed liberally in their favor. *Choate v. Trapp*, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

Mindful of these principles, I find that defendants' application of HHS standards to LaPaz was not in accordance with law, namely the Indian Self–Determination Act, because of a failure to elicit and give due consideration to the Tribe's views on the proposed disqualification of LaPaz. In applying general HHS civil service regulations without adequately involving the Tribe, defendants neglected the federal government's commitment to the maintenance of the unique and continuing relationship with Indian tribes, including federal support and assistance for tribes in the development of strong and stable tribal governments.[16] A unilateral ultimatum that directly impinges on tribal members' expression of electoral will must be preceded by meaningful consultation.

Although IHS does not have a policy of prior consultation, as did the BIA in *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707 (8th Cir.1979), I conclude under these circumstances that the Self–Determination Act "created a justified expectation on the part of the Indian people that they will be given a meaningful opportuni-

---

will accord some degree of deference to an agency's statutory interpretation and application, particularly when the agency is charged with administering the relevant statute. *Moon v. United States Dept. of Labor*, 727 F.2d 1315, 1317–18 (D.C.Cir.1984). Neither the HHS nor the INS is charged with administering the criminal statute cited by defendants. After raising the issue of this statute as somewhat of an afterthought, not until LaPaz had re-submitted his request to engage in "outside activity," defendants have offered only vague and unconvincing explanations of the statute's pertinence in this instance. Therefore, I find the employment action in dispute to be insufficiently supported by the cited criminal statutes.

**16.** Even beyond giving separate consideration to Indian issues overall, Congress has emphasized the need to address specific tribal concerns within the Indian context, noting the shortcomings of broad federal policy, even when extending only to Indian tribes: "Given the diversity of tribal conditions, broad new federal policies rarely meet the needs of all tribes. The Indian Self–Determination Act provides tribes with the opportunity to design and implement policies appropriate to their local needs." S.Rep. No. 274, 100th Cong. (1987), 1st Sess., 1988 U.S.Code Cong. & Admin.News, pp. 2620, 2625, 1987 WL

61567, p. 6 (Leg.Hist.) (Senate report, Pub.L. 100–472 (1988)).

I further observe that defendants' reliance on general criminal statutes also exhibited this same neglect. Regarding 18 U.S.C. §§ 203 and 205, defendants contend that, because Congress has not exempted Indian employees from the conflict of interest laws applicable in this instance, Congress intended the laws to apply to Indians and, in that way, the laws are not a blind transference of general civil service laws and indeed are tailored to the Indian context. Defendants state: "when Congress wants to provide an exception to the conflict of interest laws to provide for the unique relationship between Indians and the Federal Government, it has done so." Defendants' brief in support of motion for summary judgment, filed April 26, 1991, p. 6 (noting the 1989 amendment to 18 U.S.C. § 208, exempting from criminal penalty, under § 216, Indian employees engaged in official government activity affecting birthrights in the Indian employee's tribe, band, nation or other such group, Pub.L. 101–194, § 405(2)). Nonetheless, I do not read Congress' failure to act as the equivalent of an affirmative tailoring or intended transference of general civil service regulations to the Indian federal employment context.

ty to express their views" before the agency makes its decision. *Id.* at 721. Significantly, in *Oglala Sioux* the Eighth Circuit held that the BIA, by failing to confer with the Oglala Sioux tribe, not only violated its own policy but also violated the " 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' " *Id.* (quoting *Morton v. Ruiz,* 415 U.S. 199, 236, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974) (applying the Snyder Act)).

Although I am granting plaintiffs' motion, I am not holding that LaPaz or any other members of the Tribe employed by the federal government are immune from conflict of interest regulations. To the contrary, the federal government must be permitted to take administrative action against a federal employee whose election to tribal office creates a conflict with federal employment. The issue is the proper procedure for doing so. In this instance, I find that either of the following two procedures would constitute meaningful consultation with the Tribe, under the Self–Determination Act. If defendants wish to continue relying on HHS's general standards of conduct, 45 C.F.R. § 73.735–101 to –1401, defendants must afford tribal input, by formally soliciting the Tribe's view of the purported conflict and of the appropriateness of the any proposed agency action. After the Tribe has had an opportunity to express its views, the agency shall then consider the views expressed. The agency does not have to defer to the Tribe's views, but must take them into account in coming to a decision consistent with applicable law. Alternatively, defendants may wish to promulgate a specific regulation, affording the proper notice and comment under APA, that is tailored to the potential conflict between federal employment and service on a tribal council.[17] This alternative would require tribal input at the promulgation stage but not in later application, as meaningful consultation would already have been afforded. In short, these alternatives give the government a choice: of using general HHS regulations but with the requirement that in their application, that is in case-by-case interpretation, the government afford and consider tribal input; or, of developing tailored regulations under the APA that would give the Tribe input at inception.

IT IS THEREFORE ORDERED that:

1. Plaintiffs' motion for summary judgment, filed April 12, 1991, is GRANTED and defendants' cross-motion for summary judgment, filed April 26, 1991, is DENIED. Defendants will be enjoined from giving effect to the disqualifying ultimatum given to plaintiff LaPaz, absent the procedural safeguards required by this opinion.

2. Section II of my prior opinion denying defendants' motion to dismiss for lack of jurisdiction, *Mescalero Apache Tribe v. Rhoades,* 755 F.Supp. 1484, 1486–90 (D.N.M.1990), is HEREBY SUPPLEMENTED and MODIFIED to reflect the discussion of jurisdiction contained in the instant opinion.

---

**17.** In this respect, I make the following comment concerning IHS Circular No. 90–1, effective February 13, 1990, which specifically prohibits "[m]embership of an IHS employee on a tribal council (or other governing body)...." Defendants' Motion for Summary Judgment, deposition exh. no. 1, p. 5. The regulation appears to run afoul of the APA, in addition to the Self-Determination Act. APA's exemption to rulemaking requirements for matters "relating to agency management or personnel ...," 5 U.S.C. § 553(a)(2), is unavailable, ostensibly, because of the administrative action's extra-agency impact. *See Stewart v. Smith,* 673 F.2d 485, 503–04 (D.C.Cir.1982); *Joseph v. United States Civil Service Com.,* 554 F.2d 1140, 1153 n. 23 (D.C.Cir.1977). *See also Vigil v. Andrus,* 667 F.2d 931, 935 (10th Cir.1982) (involving "contracts" exceptions under § 553(a)(2)).